```
            IN THE UNITED STATES DISTRICT COURT FOR
          THE DISTRICT OF MARYLAND, NORTHERN DIVISION
                              *
ABDUL KHALIQ MUSTAFA
MUHAMMAD,                     *

     Plaintiff,               *

         v.                   *    CIVIL NO.: WDQ-08-1290

PROVIDENT BANKSHARES CORP.    *

                              *
     Defendant.
*    *    *    *    *    *    *    *    *    *    *    *    *
```

MEMORANDUM OPINION

Abdul Khaliq Mustafa Muhammad sued Provident Bankshares Corporation ("Provident") for violating Title VII of the Civil Rights Act of 1964.[1] Pending are Provident's motions for summary judgment and to dismiss for discovery abuses and noncompliance with this Court's orders. For the following reasons, the motion for summary judgment will be granted.[2]

I.  Background[3]

Muhammad, an Islamic African-American, was an employee of Provident in Baltimore, Maryland until he was fired on February

---

[1] 42 U.S.C. §§ 2000e *et seq.* (2000).

[2] Because the Court will grant the summary judgment motion, the Court will deny the motion to dismiss for discovery abuses and noncompliance with court orders as moot.

[3] For the purposes of this motion, the Court will draw inferences from the facts in the light most favorable to Muhammad, the non-moving party. *See Matsushita Elec. Indus. Co.*

2, 2007. Compl. ¶ 6(xxvi). Muhammad alleges that he was fired because of his race, sex, color, and religion. *Id*. ¶ 6(xxvii).

Muhammad alleges that in May 2006, he was assigned to train Myra Metz, a Caucasian woman, on software, and she was confrontational and challenged his authority because of his race, sex, and religion. *Id*. ¶ 6(i)-(ii). Muhammad asserts that this was part of a plan to create conflict leading to his termination. *Id*. ¶ 6(ii). He asserts that William Brooks, Muhammad's direct supervisor, defended Metz's attitude while disregarding Muhammad's concerns. *Id*. ¶ 6(iii)-(v).

Muhammad alleges that Metz told Therese Rafferty, her supervisor, that Muhammad was difficult and unapproachable because of his race and religion. *Id*. ¶ 6(vi). Muhammad states that in June 2006, Rafferty began sending him email--on which Brooks was copied--scrutinizing his work ethic. *Id*. ¶ 6(vii). Muhammad also asserts that, although it was company policy for management to support employee complaints, Brooks was unhelpful because of Muhammad's ethnicity. *Id*. ¶ 6(viii) According to Muhammad, in September 2006 Brooks told him that they were "going to make [him] a Christian." *Id*. ¶ 6(xiv). Muhammad also claims that Brooks did not ask him to present an update during a staff meeting because of his ethnicity. *Id*. ¶ 6(xiii).

---

*v. Zennith Radio Corp.*, 475 U.S. 574, 587 (1986).

In August 2006, Muhammad and Brooks discussed a personnel report documenting his "pattern of behavior involving communication and conflict with employees within the risk management group."[4]  Def.'s Mot. Summ. J. Ex. 2 (Bill Brooks Memorandum, Aug. 22, 2006) [hereinafter Brooks Memo].  In December 2006, the Director of Internal Control, Mike Helmus, met with Muhammad to discuss specific complaints[5] and reminded him of Provident's "Harassment, Sexual Harrassment & Inappropriate Behavior" policy.  *Id*. Ex. 3 (Mike Helmus Memorandum, December 4, 2006) [hereinafter Helmus Memo.].  Helmus asked Muhammad to sign a Performance Improvement Plan, but Muhammad refused and submitted a rebuttal.  Valerie E. Brandenburg Aff. ¶¶ 6-7, July 31, 2009.

On December 22, 2006, Valerie Brandenburg, a Provident human resources manager, and Muhammad discussed the conspiracy,

---

[4] Brooks noticed "conflict between Abdul and Dana Jung during the implementation of a business continuity plan." Brooks Memo. 1.  He was also brought in to "referee" two conflicts between Muhammad and Metz.  *Id*.  On September 7 and 8, 2006, problems between Muhammad and Rafferty led to Brooks's meeting with Muhammad to discuss his "pattern" of conflict with other employees.  *Id*.

[5] During his investigation, Helmus learned that Muhammad made the following comments to co-workers: "I should have done more work than you because I am a man," "it's my job to do more as a man," "A woman is supposed to get pregnant once married." Helmus Memo. 1.  Helmus also heard Muhammad "make innappropriate comments regarding the intelligence required to perform audit work."  *Id*.

inequitable treatment, and harassment concerns in his rebuttal. *Id*. ¶ 7.  After investigation, Provident decided these claims were unfounded.  *Id*.

In early December 2006, Muhammad was informed that his job description had changed, but Provident never gave it to him. Pl.'s Opp. Exs. D & E.  Around that same time, Provident decided to discontinue the software that Muhammad supported, downsized the Risk Management Department, and eliminated Muhammad's Risk Analyst position.  *Id*. ¶ 8.  On January 8, 2007, Muhammad was given the choice to quit with severance pay or be demoted to Auditor.  *Id*. ¶ 9.  On January 19, 2007, Muhammad wrote Brandenburg that he had been discriminated against because of his race, sex, and religion.  Pl.'s Opp. Ex. B.  Later that day, Provident informed Muhammad that he no longer had options and fired him.  Brandenburg Aff. ¶ 9.

On January 24, 2007, Muhammad filed discrimination charges with the U.S. Equal Employment Opportunity Commission ("EEOC"). On February 20, 2008, the EEOC sent Muhammad a notice of dismissal of his charge and his right to sue.  Paper No. 1 Ex. 2.  On May 16, 2008, Muhammad filed this suit.  Paper No. 1.  On August 29, 2008, this Court dismissed the claims against Brooks, Helmus, Brandenburg, Raferty, and Metz.  Paper No. 19.

4

During discovery, Muhammad was twice ordered to pay sanctions for discovery abuses; they are unpaid. Paper Nos. 45 & 55, Def.'s Mot. to Dismiss 5. On July 31, 2009, Provident filed motions for summary judgment and to dismiss for discovery abuses and non-compliance with court orders. Paper Nos. 60 & 61.

II. Analysis

    A.   Standard of Review

Under Rule 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in h[is] favor," *Dennis v. Columbia Colleton Med.*

*Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (*quoting Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

    B.   Provident's Motion for Summary Judgment

        1.   Title VII Wrongful Termination Claim

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[6]  42 U.S.C.A. § 2000e-2(a)(1).  Muhammad argues that he was fired because he is an African-American, black, Muslim, male.[7]

Under Title VII, a plaintiff may establish a prima facie case of discrimination by direct or circumstantial evidence.

---

[6] Although Muhammad's opposition claims age discrimination, Pl.'s Opp. Summ. J. 1, 3-4, his complaint does not state his age and alleges only Title VII claims, Compl. ¶ 3.  Title VII does not apply to age discrimination.  *See* 42 U.S.C.A. §§ 2000e, *et seq*.

[7] Muhammad also claims national origin discrimination, but his complaint fails to allege his "place or origin" or that he has the "physical, cultural or linguistic characteristics of a

6

*See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003); *Worden v. SunTrust Banks, Inc.*, 549 F.3d 334, 342 (4th Cir. 2008). To prove a Title VII violation by circumstantial evidence, Muhammad may proceed under the three-step scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), refined in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) and *Williams v. Giant Food, Inc.*, 370 F.3d 423, 430 (4th Cir. 2004). First, Muhammad must show a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Williams*, 370 F.3d at 430.

Because Muhammad has presented no direct evidence of discrimination, he must establish a claim by circumstantial evidence. Muhammad must show that (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was meeting his employer's legitimate expectations; and (4) the position remained open or was filled by a similarly qualified applicant outside the protected class. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Williams v. Cerbonics*, 871 F.2d 452, 455 (4th Cir. 1989). The burden of showing a *prima facie* case is not onerous, *Burdine*, 450 U.S. at 253, and is "relatively easy," *Evans v. Techs.*

---

national origin group." 29 C.F.R. § 1606.1 (2009).

*Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996).

It is undisputed that Muhammad, who is African-American and Muslim, is a member of a protected class. It is also undisputed that Provident fired him on January 19, 2007. Muhammad must show that he met Provident's legitimate expectations, and his position remained open after his termination.

i.  Meeting Provident's Legitimate Expectations

Provident argues that, before his termination, Muhammad engaged in an unacceptable "pattern of inappropriate communication and conflict with co-workers." Def.'s Mot. Summ. J. 9. It is undisputed that Brooks intervened in conflicts Muhammad had with Jung, Metz, and Rafferty. *See* Brooks Memo. 1. Muhammad was warned about his behavior and told that he needed to improve. *Id*. Helmus received further complaints and learned that Muhammad had told his co-workers that: "I should have done more work than you because I am a man," "it's my job to do more as a man," "[a] woman is supposed to get pregnant once married." Helmus Memo. 1. Helmus also heard Muhammad "make innappropriate comments [about] the intelligence required to perform audit work." *Id*. Reports by Brooks and Helmus, filed after meeting with Muhammad, document the complaints from his colleagues[8] and

---

[8]  *See supra* notes 4-5 and accompanying text.

8

their observations of his inappropriate behavior.[9]  *See* Brooks Memo. 1; Helmus Memo. 1.  Following these meetings, Muhammad was placed on a "Performance Improvement Plan" in December 2006.  Brandenburg Aff. ¶ 6.  On these facts, Provident argues that Muhammad was not meeting its legitimate expectations at the time he was fired.

Muhammad does not challenge this evidence but instead argues that his August 2006 Mid-Year Performance Report shows that he was meeting Provident's legitimate expectations.  Pl.'s Opp 3, Ex. F.  In that report, Brooks noted that Muhammad was "on target," having "met objectives" and "attained expected results."  *Id*. Ex. F.  Provident notes this mid-year report only assessed Muhammad's task performance and did not evaluate his interpersonal skills and workplace demeanor.[10]  Def.'s Reply 3-4;

---

[9] Brooks "observed over a period of time (approximately the last 6-8 months) a pattern of behavior involving communication and conflict with employees within the risk management group . . . [Brooks] explained [he] could not tolerate situations such as this occurring within our group and he had to improve or more formal action would have to be taken."  Brooks Memo. 1.  "On September 22, 2006, [Muhammad's] Manager, Bill Brooks met with [him] to discuss complaints brought to his attention regarding a pattern of inappropriate communication and conflict with [his] colleagues . . . Since that time we have received additional complaints from [his] colleague[s] regarding [his] communication."  Helmus Memo. 1.

[10] Provident evaluates communication and interpersonal skills in a separate annual review.  Def.'s Reply 4.  Muhammad's last annual review covered the period between May 16 and December 31, 2005.  *Id*. Ex. 7.  In the "core competencies"

*Compare* Pl's Opp. Ex F *with* Def.'s Reply Ex. 7 (showing the different evaluation criteria).  This report covered the period from February 1 to August 1, 2006; Muhammad's first meeting to discuss his alleged pattern of misbehavior was on September 22, 2006.  *See* Pl.'s Opp. Ex. 7, Brandenburg Aff. ¶ 6.

There is conflicting evidence whether Muhammad was meeting Provident's expectations.

### ii. Position Remained Open After Muhammad's Dismissal

Provident argues that the Risk Analyst position--the job Muhammad occupied prior to his termination--was eliminated as a cost-saving measure after his departure.  Brandenburg Aff. ¶¶ 8, 10.  It did not hire another person for the Auditor position which Provident had offered Muhammad when it downsized his department.  *Id*. ¶ 10.  Thus, after Muhammad's termination, his position did not remain open, and Provident did not fill it.  *Id*.  Nor did Provident replace Muhammad in either the Risk Analyst or Auditor jobs.[11]  *Id*.  Accordingly, Muhammad has not shown a prima facie case of discriminatory discharge.

---

section, he received average marks for "integrity," "caring," "excellence," and "results driven."  *Id*.  He received above average marks for "partnership" because he "worked well with other departments to develop and expand the risk management webpage."  *Id*.

[11]  Muhammad does not know whether his position exists or is open.  Pl.'s Depo. 293:5-12, March 10, 2009.

10

      2.   Breach of Contract Claim

Muhammad contends that Provident offered him an "option contract," which he accepted before Provident withdrew the offer. *See* Pl.'s Opp 2, 18. This claim was not raised in the complaint, and Muhammad has not sought to amend his complaint to include it.[12]

## III. Conclusion

For the reasons discussed above, Provident's motion for summary judgment will be granted, and its motion to dismiss[13] will be denied.

November 16, 2009                             _____/s/_____
Date                                                 William D. Quarles, Jr.
                                                          United States District Judge

---

[12] Muhammad was an "at will" employee of Provident. "The employee at-will doctrine has long been part of the common law of Maryland." *Porterfield v. Mascari II, Inc.*, 374 Md. 402, 421-22, 823 A.2d 590, 601 (2003) (*citing McCullough Iron Co. v. Carpenter*, 67 Md. 554, 11 A. 176 (1887)). "It[]s major premise is that an employment contract is of indefinite duration, unless otherwise specified, and may be terminated legally at the pleasure of either party at any time." *Id*. at 422, 823 A.2d at 601-02 (citations omitted). Had Muhammad accepted the auditor position, Provident would have been free to terminate him immediately for any reason that did not violate public policy. *See Adler v. American Standard Corp.*, 291 Md. 31, 43, 432 A.2d 464, 471 (1981).

[13] Though it requested reasonable expenses for Muhammad's failure to comply with the May 20, 2009 Letter Order and attorneys' fees and costs related to this motion, Provident has not provided evidence of these costs and expenses. See Def.'s Mot. to Dismiss 15.